

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ALB:EMR
F. #2018R01310/NY-NYE-864

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 9, 2020

By ECF

Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Amaury Abreu, et al
     Criminal Docket No. 20-CR-433 (RRM)

Dear Judge Bulsara:

  The government respectfully submits this letter to request a permanent order of detention with respect to the defendants Amaury Abreu, Julio Bautista and Gustavo Valerio, charged in the above-referenced case. For the reasons set forth below, the Court should enter a permanent order of detention for each of the defendants, as no combination of conditions can secure their appearance at trial and the safety of the community.

I. Factual Background

 A. Overview

  Between at least January 2016 and October 2020, Abreu, Bautista and Valerio were members of a multinational drug trafficking organization ("DTO") with distributors in the New York-metropolitan area and the Dominican Republic. During that time, the DTO imported multi-kilogram quantities of cocaine into the United States through a variety of means, including by sending drug couriers on flights to the United States, concealing narcotics in mail and tractor trucks that enter the United States from Mexico, and concealing narcotics in produce shipments that are imported into the United States.

  Between January 2016 and February 2017, the DTO sent a series of drug couriers on flights to New York from the Dominican Republic. When the couriers landed in JFK Airport in Queens, New York, they were escorted through customs and baggage claim by a corrupt CBP officer who was part of the conspiracy. After they went through customs, the couriers were met by a driver who took them to a safe house where they waited to be paid.

Five couriers connected to the DTO, the corrupt CBP officer and the driver were arrested at JFK airport between January 2016 and February 2017. In total, law enforcement agents seized more than approximately 50 kilograms of cocaine and $3,622 from the couriers at the time of their arrests.

In addition, in approximately May 2018, the DTO sent a shipment of approximately 250 kilograms of cocaine concealed in boxes of produce imports from the Dominican Republic to the Red Hook Port in Red Hook, Brooklyn, New York. CBP officers at the port identified and seized the cocaine.

In approximately July 2019, the DTO sent a shipment of approximately 66 kilograms cocaine concealed in boxes of produce imports from the Dominican Republic to a warehouse in Philadelphia, Pennsylvania. CBP officers identified and seized the cocaine.

Between the airport seizures, the Red Hook Port seizure and the Philadelphia seizure, since 2016 law enforcement agents have seized more than 350 kilograms of cocaine belonging to the DTO.

B.   The Defendants' Crimes

Abreu, Bautista and Valerio all played key roles in the DTO between January 2016 and October 2020.

i.   Amaury Abreu

Abreu, a police officer with the New York Police Department ("NYPD"), abused his position by providing information to the DTO about law enforcement procedures and performing warrant checks on members of the DTO using the NYPD arrest database. In addition, on at least one occasion, Valerio, a high-ranking member of the DTO, gave Abreu cocaine to distribute.

Messages between Abreu and the DTO's leadership reflect Abreu's efforts to assist the DTO's leadership in concealing the DTO's criminal activities, and to keep the leadership advised of ongoing law enforcement operations that might impact the DTO's business. For example, in January 2016, Abreu messaged the DTO's leadership, in substance, "Today I'm going to find out the thing I couldn't yesterday because there were too many people at the office." One day later, Abreu messaged the DTO's leadership, in substance, that an associate of the DTO was "fine, because here in New York you don't see information from another state when we run a license from another state only if they're wanted so if they stop him tell him to say he lives in Pennsylvania and not in New York and it's cool . . . ."

On or about March 11, 2016, the DTO's leadership sent Abreu a message containing Gustavo Valerio's full name, date of birth and social security number. An audit of the NYPD's arrest database revealed that, that same day, Abreu searched for Valerio's name in the database – despite having no legitimate law enforcement purpose for doing so. A few

days later, presumably after learning that his warrant check was clear, Valerio travelled to the Dominican Republic.

In May 2016, Abreu sent messages to the DTO's leadership asking about a license plate that Abreu had provided, "in case anything happens." A member of the leadership responded in substance, "that's my guardian angel brother I don't leave it anywhere thanks so much."

On or about August 12, 2016, Abreu sent messages to the DTO's leadership informing them of "a little clean-up of the enemy's people on Wednesday . . . .[t]wo for sure, but they're keeping it quiet until they clean up, because it was the Feds." These messages likely referred to a law enforcement operation that occurred on August 11, 2016, when federal agents arrested several individuals associated with a rival drug trafficking organization to the DTO.

There is evidence that, in addition to assisting the DTO, Abreu was directly involved in the DTO's operations. For example, as noted above, Valerio, a high-ranking member of the DTO, gave Abreu cocaine to distribute on at least one occasion. Valerio also exchanged messages with the DTO's leadership indicating that, as part of his money-collection duties on behalf of the DTO, he collected money from Abreu.

There is strong evidence of Abreu's ongoing connection to the DTO. Indeed, phone records confirm that Abreu has been in almost daily contact touch with the DTO's leadership between 2018 and as recently as November 3, 2020. Travel records show that Abreu traveled to meet with the DTO's leadership in the Dominican Republic in January and February 2020.

    *ii.    Julio Bautista*

Bautista was a high-ranking member of the DTO based in New York, and, along with Valerio and others, was responsible for distributing and overseeing the distribution of cocaine once it arrived in New York. Bautista was actively involved in the airport and produce shipment importation schemes described above, and he regularly sold large quantities of the cocaine that the DTO brought into New York. As recently as May 2019, for example, Bautista was tasked with selling a large quantity of cocaine that the DTO shipped to a port in Pennsylvania, concealed in produce imports.

On January 2, 2020, law enforcement agents in Nassau County searched a house belonging to Bautista pursuant to a search warrant signed by a judge in Nassau County Supreme Court. During the execution of the warrant, the agents seized approximately 5.8 kilograms of cocaine, approximately $4,300, a cocaine press, a mechanical trap table, digital scales, a money counting machine and numerous items of drug packaging equipment.

### iii. Gustavo Valerio

Like Bautista, Valerio was a high-ranking member of the DTO responsible for distributing and overseeing the distribution of the DTO's cocaine in New York. Valerio was also actively involved in the airport and produce shipment importation schemes described above, and regularly sold large quantities of the cocaine that the DTO brought into New York. Valerio was also involved in laundering the proceeds of those sales back to the DTO's leadership in the Dominican Republic. As noted above, Valerio also provided cocaine to Abreu on at least one occasion.

Like Abreu, Valerio was regularly in contact with the DTO's leadership about the DTO's operations. For example, in January 2016, Valerio messaged the DTO's leadership about an associate of the DTO who was arrested on federal money laundering charges. In March 2016, Valerio messaged the DTO's leadership repeatedly about confirming whether he had an active warrant – which, as noted above, Abreu eventually looked into for him. In September 2016, Valerio messaged the DTO's leadership about collecting money from various individuals, including Abreu, and about individuals who owed money. Valerio also frequently messaged the DTO's leadership about providing them with license plates, phones and cars. Finally, as with Abreu, travel records show that Valerio traveled to meet with the DTO's leadership in the Dominican Republic numerous times during the charged time period.

### C. The Indictment and the Arrests

In connection with their crimes, on November 5, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging Abreu, Bautista and Valerio with (i) one count of conspiracy to import five kilograms or more of a substance containing cocaine, in violation of Title 21, United States Code, Sections 952 and 963, and (ii) one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of a substance cocaine, in violation of Title 21, United States Code, Sections 841 and 846. The indictment also charges Bautista with one count of possession of five kilograms or more of cocaine with intent to distribute it, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)(II), in connection with the cocaine recovered from his house on January 2, 2020.

On November 5, 2020, U.S. Magistrate Judge Steven M. Gold issued warrants for the defendants' arrests. Federal agents arrested the defendants at their homes earlier today.

At the time of his arrest, Valerio was hiding in the concealed storage area of a bed in his house. Agents had to take apart pieces of the bed to remove Valerio and place him under arrest.

D.  The Defendants' Criminal Histories

Abreu does not have any prior criminal convictions.

Bautista has a prior felony Conspiracy in the Fourth Degree conviction from Suffolk County from July 2019, for which he is currently on probation.[1]

Valerio has several prior convictions, including (i) one prior felony conviction for Fourth Degree Unsworn Falsification to Law Enforcement from Ocean County, New Jersey, from January 2018; (ii) one prior felony conviction for Attempted Forgery in the Second Degree from Queens County from December 2012; (iii) one prior felony conviction for Grand Larceny in the Third Degree from Kings County from October 2009; (iv) one prior misdemeanor conviction for Unauthorized Use of a Vehicle from Kings County from October 2009; (v) two prior traffic infractions, including one for Driving while Ability Impaired by Alcohol from Queens County from March 2016; and (iv) a prior disorderly conduct violation. He also has one prior parole revocation.

II.  Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that he does not pose a danger to the community or risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted). In any event, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Detention based on danger to the community must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

---

[1] At the time of his arrest in the case that led to his 2019 conviction, Bautista provided the name "Cesar Bautista," possibly in an effort to disguise himself as his brother and co-defendant Cesar Diaz-Bautista. However, law enforcement agents have confirmed with Bautista's probation officer that he, Julio Bautista, was the defendant charged and convicted in that case.

5

The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g). Once a defendant has met his burden relating to danger to the community and risk of flight, the presumption in favor of detention does not disappear entirely but remains a factor for the court to consider. Mercedes, 254 F.3d at 436.

III.     A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendants' appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, Abreu, Bautista and Valerio each face a ten-year mandatory minimum sentence of prison on Counts One and Two of the indictment, and Bautista faces an additional ten-year mandatory minimum on Count Three. These offenses carry the presumption for detention. See id. Accordingly, the defendants bear the initial burden of showing that they are not a danger to the community nor a flight risk. For the reasons set forth below, they cannot sustain that burden.

IV.     The Defendants Are a Danger to the Community and Present a Serious Risk of Flight

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). That danger is particularly strong here because of the defendants' long history of drug trafficking. The scope and continuous nature of the defendants' criminal conduct demonstrates that they are responsible, in part, for the steady supply of illicit drugs that flow through and around the Eastern District of New York, significantly compromising the quality of life for the residents of that community. What's more, as described below, Abreu's position as an NYPD officer and Bautista and Valerio's criminal histories have failed to deter them from engaging in criminal activities.

The defendants also pose a risk of flight. Given the significant jail time they face upon conviction, each defendant has a strong incentive to flee the jurisdiction. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond to Mexico); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms of 105 years imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a severe sentence" heightens the risk of flight). In addition, the evidence makes clear that all three of the defendants have strong ties to the

6

Dominican Republic, including to other members of the DTO based there. Federal courts have repeatedly recognized that "[f]light to avoid prosecution is particularly high among persons charged with major drug offenses," because "drug traffickers often have established ties outside the United States . . . [and] have both the resources and foreign contacts to escape to other countries." United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985).

V. The Bail Reform Act Weights in Favor of Detention

All four factors of the Bail Reform Act weigh in favor of detaining Abreu, Bautista and Valerio. Over a four year period, the defendants conspired with others to import large amounts of cocaine into the United States and to distribute that cocaine. The evidence supporting these serious charges is strong, including testimony from multiple cooperating witnesses, recorded communications with members of the DTO, electronic communications in which the defendants and their co-conspirators discuss the operations of the DTO, financial records and travel records – all in addition to the above-described evidence of more than 350 kilograms of cocaine seized by law enforcement between 2016 and 2020.

The defendants' personal history and characteristics also demand detention. Beginning with Abreu, although he does not have a criminal history, the evidence demonstrates that he prioritized his personal greed over his sworn duties as a public servant, and assured the continued success of a sophisticated drug trafficking organization. As Abreu's criminal conduct makes clear, he has no respect for public authority or the rule of law, and there is no reason to believe that the defendant would obey the Court's orders or conditions of release if bail were granted.

Bautista has not only distributed cocaine on behalf of the DTO over the past four years, but he continued to do so after being convicted of a felony in 2019 and placed on probation. In addition, in January 2020, close to six kilograms of cocaine were recovered from Bautista's house.

Valerio has been an active member of the conspiracy despite his numerous prior felony and misdemeanor convictions and infractions, including a felony conviction from 2018 for making a false statement to law enforcement. Clearly, these prior convictions have failed to deter Valerio from engaging in serious crimes. In addition, earlier today Valerio concealed himself from the arresting agents by hiding in the storage area of a bed, causing the agents to have to take apart pieces of the bed to place him under arrest.

VI.       Conclusion

For the reasons set forth above, no combination of bail conditions will ensure the safety of the community and the defendants' continued appearance before the Court. For the foregoing reasons, the government respectfully requests that the court issue a permanent order of detention as to defendants Abreu, Bautista and Valerio.

                                  Respectfully submitted,

                                  RICHARD P. DONOGHUE
                                United States Attorney

By:    /s/   Erin Reid
        Erin Reid
        Assistant U.S. Attorney
        (718) 254-6361

cc:       Defense Counsel, Esq. (by E-mail)
           Clerk of Court (by ECF)